1
2
3
4
5
6
7

Anna T. Neill (State Bar No. 270858)
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Blvd.
Miami, Florida 33131-4327
Telephone:   (305) 373-1000
Facsimile:   (305) 372-1861
Email: aneill@knpa.com
*Attorneys for Plaintiff*

8
9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10

IN RE LIDODERM ANTITRUST
LITIGATION

MDL DOCKET NO. 2521
Case No. 14-md-2521-WHO

11
12
13
14
15
16
17
18

CVS PHARMACY, INC.,

               Plaintiff,

    v.

ENDO PHARMACEUTICALS INC., TEIKOKU
PHARMA USA, TEIKOKU SEIYAKU CO.,
WATSON PHARMACEUTICALS, INC.,
ACTAVIS, PLC, and
WATSON LABORATORIES, INC.

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.

COMPLAINT
JURY TRIAL DEMANDED

19
20
21
22
23
24
25

Plaintiff CVS Pharmacy, Inc. files this Complaint under the antitrust laws of the United States against Defendants Endo Pharmaceuticals Inc. ("Endo"), Teikoku Pharma USA ("Teikoku Pharma"), Teikoku Seiyaku Co. ("Teikoku Seiyaku") (collectively "Teikoku") (together, "Endo/Teikoku"), and Watson Pharmaceuticals, Inc., Actavis, plc, formerly known as Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. (collectively "Watson"). For its Complaint, Plaintiff alleges as follows:

## I.     NATURE OF THE ACTION

26
27
28

1.     This is a civil antitrust action brought by purchasers of a lidocaine patch 5% sold by Endo under the brand name Lidoderm.  Lidoderm is a lidocaine-containing patch indicated for

the treatment of pain associated with post-herpetic neuralgia.  Plaintiff seeks overcharge damages and other relief arising out of Defendants' unlawful foreclosure of generic competition in the market for lidocaine patch 5%.

2.     On May 28, 2012, Endo/Teikoku entered into an unlawful non-competition agreement with Watson.  Under the agreement (the "Reverse Payment Agreement" or "Agreement"), Watson agreed to delay marketing its less-expensive generic version of Lidoderm for almost 13 months, until September 15, 2013.  In exchange, Endo/Teikoku agreed to pay Watson and did, in fact, pay Watson  (a) at least $96 million in the form of branded Lidoderm provided at no cost to Watson, which Watson could then resell (and did, in fact, resell) at that price; and (b) by forbearing from launching an authorized generic to compete with Watson's generic Lidoderm until 7½  months after Watson's generic belatedly entered the market, effectuating payment of hundreds of millions of dollars from Endo/Teikoku to Watson.  In compliance with the Agreement, even though Watson was granted final FDA approval to launch its less-expensive generic Lidoderm patch on August 23, 2012, Watson did not come to market until September 15, 2013, thirteen (13) months later.

3.     But for Defendants' unlawful Reverse Payment Agreement, one or more generic versions of Lidoderm would have entered the market as early as August 23, 2012.  Thus, absent Defendants' unlawful Reverse Payment Agreement, Plaintiff and/or its assignors would have been able to purchase their requirements of lidocaine patch 5% at significantly lower prices substantially earlier than they did, rather than being forced to pay for brand and generic Lidoderm at higher prices because of the unlawful agreement.  Endo stated in its annual reports that sales of Lidoderm were $825 million in 2011 and $947 million in 2012.

4.      Defendants' unlawful Reverse Payment Agreement was designed to and did in fact: (i) delay and/or preclude the entry of less-expensive generic versions of lidocaine patch 5%; (ii) delay the introduction of an authorized generic lidocaine patch 5%, which otherwise would have appeared on the market at a significantly earlier time and lowered prices further; (iii) fix, raise, maintain or stabilize the prices of lidocaine patch 5% product; (iv) permit Endo to maintain a monopoly for lidocaine patch 5%; (v) allocate 100% of the lidocaine patch 5% market in the

United States to Endo for up to 13 months; and (vi) allocate 100% of generic lidocaine patch 5% sales in the United States to Watson for 7½ months.

5. Defendants violated §§ 1 and 2 of the Sherman Act through their anticompetitive Reverse Payment Agreement, which unreasonably restrained competition in the market for lidocaine patch 5% and improperly maintained and extended Endo's market and monopoly power by foreclosing or delaying competition from lower-priced generic versions of lidocaine patch 5%.

## II.    THE PARTIES

6. Plaintiff CVS Pharmacy, Inc. ("CVS") is a Rhode Island company with its principal place of business at One CVS Drive, Woonsocket, RI 02895. CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through its mail service dispensing pharmacies and more than 9,500 retail drugstores operated by its affiliates. CVS brings this action on its own behalf and as the assignee of McKesson Corporation, Cardinal Health, Inc., Bindley-Western, Inc. and National Pharma-Pak, which during the relevant period purchased Lidoderm directly from Endo for resale to CVS, and which have assigned their claims arising out of those purchases to CVS.

7. Defendant Endo is a Delaware corporation, with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania, 19355. Endo markets and sells Lidoderm throughout the United States.

8. Defendant Teikoku Seiyaku is a company organized and existing under the laws of Japan, with its principal place of business in Higashikagawa, Kagawa, Japan. Teikoku Seiyaku is the owner, assignee, or licensee of U.S. Patent No. 5,827,529 (the "'529 patent") over which Endo and Teikoku sued Watson. Teikoku Seiyaku manufactures Lidoderm in Japan for commercial sale in the United States by Endo under a Manufacturing and Supply Agreement with Endo. Endo pays Teikoku Seiyaku royalties under that agreement.

9. Defendant Teikoku Pharma is a California corporation, with its principal place of business at 1718 Ringwood Avenue, San Jose, California, 95131. Teikoku Pharma is a wholly-

1   owned subsidiary of Teikoku Seiyaku, and is the holder of the New Drug Application for

2   Lidoderm.

3       10.     Defendant Actavis, plc is incorporated under the laws of Ireland, with its principal

4   place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland.  Actavis, plc also has a

5   place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey,

6   07054.

7       11.     Defendant Watson Pharmaceuticals, Inc. was a Nevada corporation, with its

8   principal place of business at 311 Bonnie Circle, Corona, California, 92880.  As a result of

9   Watson Pharmaceuticals, Inc.'s acquisition of Actavis Group in or around October 2012, effective

10  on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc.

11  Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

12      12.     Defendant Watson Laboratories, Inc. is a Nevada corporation, with its principal

13  place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey

14  07054.  Defendant Watson Laboratories, Inc. was a wholly-owned subsidiary of Watson

15  Pharmaceuticals, Inc. and is now a subsidiary of Actavis, plc.

16      13.     Watson was and is engaged in the marketing, production, and distribution of

17  generic pharmaceutical products, including through its wholly-owned wholesaler affiliates Anda,

18  Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc.

19      14.     All of Defendants' actions described in this complaint are part of, and in

20  furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by

21  Defendants' various officers, agents, employees, or other representatives while actively engaged

22  in the management of Defendants' affairs (or that of their predecessors-in-interest) within the

23  course and scope of their duties and employment, and/or with the actual, apparent, and/or

24  ostensible authority of Defendants.

25      15.     With respect to all of the conduct complained of below, Endo at all relevant times

26  acted in concert with its supplier Teikoku.  Moreover, Endo, Teikoku Pharma, and Teikoku

27  Seiyaku each signed the Reverse Payment Agreement with Watson.  Furthermore, Endo, Teikoku

28  Pharma, and Teikoku Seiyaku at all relevant times acted as a single entity with respect to the

material provisions and performance of the Reverse Payment Agreement, which refers to Endo, Teikoku Pharma, and Teikoku Seiyaku collectively in provisions relating to the grant of patent licenses to Watson, the agreement not to launch a competing authorized generic for 7½ months, and the obligation to deliver free Lidoderm product to pay Watson.

16.     As the manufacturer and supplier of Lidoderm to Endo, and as Endo's partner in a joint marketing enterprise relating to the distribution and marketing of Lidoderm in the United States, Teikoku had a financial interest in assisting Endo to maintain its monopoly power by foreclosing and delaying competition from lower-priced generic versions of lidocaine patch 5%.

### III.     JURISDICTION AND VENUE

17.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and seeks to recover threefold damages and other relief for the injuries sustained by Plaintiff and/or its assignors resulting from Defendants' unlawful restraint of trade and maintenance of monopoly power in the market for lidocaine patch 5% in the United States.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

18.     Defendants transact business within this district and carry out interstate trade and commerce in substantial part in this district, and/or have an agent, and/or can be found in this district.  Defendant Teikoku has a principal place of business in this district.  Venue is therefore appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22, 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1407.

### IV.     REGULATORY BACKGROUND

**A.**     Characteristics of the Prescription Pharmaceutical Marketplace

19.     The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition.  Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person has both the payment obligation and the

choice of products, the price of the product plays an appropriate role in the person's choice of products and, consequently, the manufacturers have an appropriate incentive to lower the prices of their product.

20.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Lidoderm, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

21.     Endo, Teikoku, and other brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives do not advise doctors of the cost of the branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

22.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand -- the extent to which unit sales go down when price goes up.  This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.  The ability to profitably raise price substantially above marginal cost is what economists and antitrust courts refer to as market power.  The result of the market imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals.

**B.    The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs**

23.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

24.    When the FDA approves a brand manufacturer's NDA, the drug product is listed in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book."  The manufacturer may list in the Orange Book any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.  The manufacturer may subsequently list in the Orange Book within thirty days of issuance any such patents issued after the FDA approves the NDA.  21 U.S.C. §§ 355(b)(1) & (c)(2).

25.    The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

**C.    The Hatch-Waxman Amendments**

26.    The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form,

route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug -- that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

27.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity, are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. §355(j)(8)(B).

28.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

29.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

**D.     Paragraph IV Certifications**

30.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

> i.     that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

ii.     that the patent for the brand drug has expired (a "Paragraph II certification");

iii. that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv. that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

31.     If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five (45) days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty (30) months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

32.     As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other generic versions of the drug. For Paragraph IV certifications made after December 2003, the first generic applicant receives 180 days of market exclusivity (unless some forfeiture event like that discussed below occurs). This means that the first approved generic is the only available generic for at least six months, which effectively creates a duopoly between the brand company and the first-filing generic during this period. This 180-day exclusivity period is extremely valuable to generic companies. While only one generic is on the market, the generic price, while lower than the branded price, is much higher than after multiple generic competitors enter the market. Generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are

multiple generic competitors on the market.  Being able to sell at the higher duopoly price for six (6) months may be worth hundreds of millions of dollars.

33.     Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to (thirty) 30 months.  That brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition -- as opposed to enforcing a valid patent that is actually infringed by the generic -- is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in cases involving 73% of the drug products studied.

34.     The first generic applicant can help the brand manufacturer "game the system" because by delaying not only its own market entry, but also the market entry of all other generic manufacturers.  The first generic applicant by agreeing not to begin marketing its generic drug, thereby delays the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking."  This tactic creates a "bottleneck" because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

35.     On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire in order to delay the start of the first-filer's 180-day period of generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products.  For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA, unless the failure is caused by a change in or review of the approval requirements.  Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite (thirty) 30 months.

36.     Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that qualified the first applicant for exclusivity (*i.e.*, as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order, entering final judgment that includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the Orange Book.

37.     Brand manufacturers and first-filing generics can structure their settlements in order to intentionally skirt these forfeiture provisions.  For example, manufacturers subvert the failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by, for example, settling their litigation before a final judgment of invalidity or non-infringement can be entered with respect to each of the patents for which the first applicant submitted a Paragraph IV certification, or seeking a consent judgment that does not include a finding that all of the patents for which the first applicant submitted a Paragraph IV certification were invalid or not infringed. When that happens, in order to trigger forfeiture and gain access to the market, subsequent ANDA applicants are forced to obtain a judgment that all patents for which the first filing generic company filed Paragraph IV certifications are invalid or not infringed.  This may require the subsequent ANDA applicant to initiate a declaratory judgment action concerning patents that the brand manufacturer did not assert against it in a Paragraph IV litigation.

38.     In addition, brand and generic manufacturers can structure their settlements in a way that grants 180 days of exclusivity to the generic even where it is likely that the generic has forfeited that exclusivity under one of the applicable MMA forfeiture provisions, *e.g.*, the failure to obtain tentative approval within 30 months of submitting a substantially complete ANDA. This results in a windfall to the generic and a subversion of the regulatory scheme.  Because the FDA will not typically make a formal 180-day exclusivity determination until another generic applicant has received final approval and is ready to launch, settlements that retain de facto

exclusivity -- even where it should be forfeited de jure under the MMA -- dissuade subsequent generic applicants from trying to obtain a court judgment of invalidity and/or infringement that would trigger the start of the 180-day period.  And, because the lion's share of the generic revenues will perceivably go to the first filer, subsequent filers have less incentive to litigate to judgment.

**E.    Benefits of Generic Drugs**

39.    Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  As a result, competition from generic drugs is viewed by brand name drug companies such as Endo/Teikoku as a grave threat to their bottom lines.

40.    Due to the price differences between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart.  Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

41.    There is an incentive to choose the less expensive generic equivalent in every link in prescription drug chain.  Pharmaceutical wholesalers and retailers pay lower prices to acquire

1   generic drugs that to acquire the corresponding brand-name drug.  Health insurers and patients

2   also benefit from the lower prices that result from generic competition.

3          42.     Generic competition enables Plaintiff and/or its assignors to purchase generic

4   versions of the drug at substantially lower prices.

5          43.     Until a generic version of the brand drug enters the market, however, there is no

6   bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the

7   brand manufacturer can continue to profitably charge supracompetitive prices without losing

8   substantial sales.  As a result, brand manufacturers, who are well aware of generics' rapid erosion

9   of their brand sales, have a strong incentive to delay the introduction of generic competition into

10  the market, including by using tactics such as the Agreements at issue here.

11              **F.     The Impact of Authorized Generics**

12         44.     The 180-day marketing exclusivity to which first-filer generics may be entitled

13  does not prevent a brand manufacturer from marketing its own generic alternative to the brand

14  drug during that 180-day period.  Such an "authorized generic" is chemically identical to the

15  brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if

16  it has one) or through a third-party generic manufacturer.  Competition from an authorized

17  generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and

18  substantially reduces drug prices for consumers.

19         45.     In its study, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*

20  (August 2011) (the "FTC Study"), the FTC found that authorized generics capture a significant

21  portion of sales, reducing the first-filer generic's revenues by approximately 50% on average

22  during the 180-day exclusivity period.  The first-filing generic makes significantly less money

23  when faced with competition from an authorized generic because: (1) the authorized generic takes

24  a large share of unit sales away from the first-filer; and (2) the presence of an additional generic

25  in the market causes prices to decrease.

26         46.     Although first-filing generic manufacturers make significantly less money when

27  they must compete with an authorized generic during the first 180 days, consumers and other

28

drug purchasers such as Plaintiff benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

47.    As a practical matter, authorized generics are the only means by which brand-name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the price of their branded drug in response to the entry of an AB-rated generic.  Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the branded drug at the same intervals and at the same rate at which they raised the price of the drug prior to generic entry.

48.    Given the significant negative impact of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers such as Plaintiff of the lower prices resulting from two forms of competition: (1) among the branded and the generic products; and (2) between the generic products.

## V.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    Approval of Brand Lidoderm and its Purported Patent Protection

49.    Lidoderm is a prescription lidocaine-containing patch approved to treat pain associated with post-herpetic neuralgia.  The active ingredient in Lidoderm is 5% lidocaine. While other drugs are available to treat the same or similar medical conditions, they are not AB-rated to Lidoderm, cannot be automatically substituted for Lidoderm by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Lidoderm, and are not economic substitutes for, nor reasonably interchangeable with, Lidoderm.

(a)     Initial Approval of Lidoderm

50.     On March 19, 1999, the FDA approved NDA 200612, submitted by Hind Health Care, Inc. ("Hind"), which sought to market an adhesive patch containing 5% lidocaine under the brand name Lidoderm.  Lidoderm was awarded Orphan Drug Exclusivity by the FDA, meaning that no generic competitor could get FDA approval to market a generic Lidoderm product until March 2006.

51.     In 1998, Hind granted to Endo the exclusive right to market and distribute Lidoderm in the United States.  Hind subsequently transferred full ownership of and responsibility for the Lidoderm NDA to Teikoku, effective June 1, 1999.  Teikoku then granted Endo the exclusive right to market and distribute the Lidoderm patch in the United States under Teikoku's NDA, and Endo launched Lidoderm in the United States in 1999.

(b)     Endo/Teikoku's Acquisition of the Lidoderm Patents

52.     Endo/Teikoku owned or obtained assignments of or licenses to a number of patents associated with Lidoderm.  Subsequently, Teikoku listed several patents in the Orange Book as covering Lidoderm.  As of January 2010 (after Watson had filed ANDA No. 200675, the first ANDA filed as to Lidoderm), Teikoku listed three patents in the Orange Book.

53.     The first was U.S. Patent No. 5,411,738 (the "'738 patent"), which is a method of use patent for treating certain types of pain with lidocaine using a topical delivery mechanism and a gel formulation of lidocaine.  The second was U.S. Patent No. 5,601,838 (the "'838 patent"), which is a method of use patent for treating certain types of pain with lidocaine.  Both the '738 and '838 patents were assigned to Hind, expired on May 2, 2012, and are referred to collectively as the "Hind patents."

54.     The third patent that Teikoku listed in the Orange Book as covering Lidoderm was U.S. Patent No. 5,827,529 (the "'529 patent"), which is a formulation patent for a lidocaine patch. This patent was assigned to Teikoku, and is set to expire on October 17, 2015.  Endo is the exclusive licensee of the '529 patent.

55.     The '529 patent, titled "External Preparation for Application to the Skin Containing Lidocaine," issued on October 27, 1998 from an application filed on June 10, 1994. That application was a continuation of an application filed on March 30, 1992.

56.     The '529 patent claims foreign priority to Japanese Application No. 3-067353, filed March 30, 1991.

57.     The '529 patent contains six claims directed generally to a hydrogel transdermal patch containing the active ingredient lidocaine and inactive ingredients or excipients.

58.     Claim 1 of the '529 patent claims a patch comprising "a drug-retaining layer placed on a support," in which the drug-retaining layer comprises an "adhesive gel base and 1 to 10% by weight of lidocaine."  The claimed "adhesive gel base" consists of three components within specific percentage weight ranges: (i) "0.5 to 50% by weight of a water-soluble high molecular weight substance"; (ii) "30 to 70% by weight of water"; and (iii) "1 to 70% by weight of a water-retaining agent."

                    (c)     Endo/Teikoku Seek to Bolster Lidoderm's Patent Coverage

59.     Endo subsequently obtained additional patents from LecTec Corporation ("LecTec") that it and Teikoku claim cover Lidoderm.  In July 2008, LecTec had filed patent infringement litigation against Endo and other manufacturers of medicinal patch products in the United States District Court for the Eastern District of Texas (the "LecTec Litigation") over U.S. Patent No. 5,536,263 (the "'263 patent"), and U.S. Patent No. 5,741,510 (the "'510 patent"), both of which are patents for a medicinal adhesive patch.  Each of these patents expired on March 30, 2014.

60.     Endo settled the litigation with LecTec in November 2009, paying LecTec $23 million in exchange for exclusive licenses to the '263 and the '510 patents for use in the field of prescription pain medications and treatment.

61.     Almost a year later, in or about October 2010, Endo granted Teikoku a sublicense under the '510 patent to make and sell prescription pain medications that contain 5% lidocaine in patch dosage form, including Lidoderm.

62.     In or about November 2010, Teikoku submitted the '510 patent to the FDA for listing in the Orange Book with respect to Lidoderm.

63.     As of January 2011, Endo/Teikoku had four patents listed in the Orange Book related to Lidoderm: the two Hind patents (which expired in May 2012), the '529 patent, and the '510 patent.

64.     In or about May 2011, in exchange for $2 million, Endo acquired from LecTec full title to the '263 patent, the '510 patent, and three other patents.  The three other patents were (i) U.S. Patent No. 6,096,333 (the "'333 patent"), (ii) U.S. Patent No. 6,096,334 (the "'334 patent"), and (iii) U.S. Patent No. 6,361,790 (the "'790 patent") (collectively with the '263 and the '510 patents, the "Rolf patents," named for one of the inventors).  These three patents all cover methods of formulating a medicinal adhesive patch and expired on March 30, 2014.  Other than the '510 patent, none of the Rolf patents was listed in the Orange Book with respect to Lidoderm.

### 2.     Watson's ANDA Threatens Endo/Teikoku's Weak Patents

65.     On November 13, 2009, Watson submitted ANDA No. 200675 to the FDA, seeking to market a generic version of Lidoderm.  On or about January 14, 2010, Watson notified Teikoku of its November 13, 2009 ANDA filing.

66.     Watson's notice letter included a Paragraph IV certification that the commercial manufacture, use, and/or sale of its generic Lidoderm product would not infringe any claim of the '529 patent, and/or that the '529 patent was invalid and/or unenforceable.  Watson was the first generic manufacturer to file an ANDA with a Paragraph IV certification with respect to Lidoderm, potentially entitling it to a six-month exclusivity period, free from competition from any other ANDA-filing generic company.  This exclusivity, however, would not have protected Watson from competition from an authorized generic version of Lidoderm.

67.     Watson did not submit Paragraph IV certifications as to the Hind patents, which were to expire on May 2, 2012.  As a result, the FDA could not approve Watson's ANDA for generic Lidoderm until the Hind patents expired on May 2, 2012.

68.     Watson made no certifications to any of the Rolf patents because the Rolf Patents were not listed in the Orange Book until November 2010, a year after Watson filed its ANDA.

69.     The FDA granted final approval to Watson's ANDA on August 23, 2012, but Watson did not launch its approved generic Lidoderm product until September 16, 2013, because of the unlawful Reverse Payment Agreement with Endo and Teikoku (described in more detail below).  No patents asserted, or capable of being asserted, by Endo/Teikoku would or could have prevented Watson from launching its approved generic Lidoderm product.

### 3.     Endo and Teikoku Scramble to Protect Their Franchise

70.     On February 19, 2010, Endo/Teikoku sued Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc., et al., v. Watson Labs., Inc.,* Civil Action No. 10-cv-00138-GMS), alleging that Watson's generic Lidoderm infringed the '529 patent (the "'529 Litigation").   As a result of the filing of the '529 Litigation, a 30-month Hatch-Waxman stay of FDA approval applied to Watson's ANDA, which precluded the FDA from approving Watson's ANDA until (i) that stay expired in mid-July of 2012 or (ii) entry of a final judgment that the '529 patent was invalid, unenforceable, and/or not infringed.

71.     Watson raised numerous defenses, including that the '529 patent was invalid and/or unenforceable.

72.     As the '529 Litigation moved toward trial, Endo/Teikoku filed yet another suit against Watson, this time using the Rolf patents.  On or about June 29, 2011, Endo filed suit against Watson in the United States District Court for the District of Delaware *(Endo Pharm. Inc. v. Watson Labs., Inc.,* Civil Action No. 11-cv-00575-GMS) (the "Rolf Patent Litigation"), alleging that Watson's generic Lidoderm product would infringe three of the Rolf patents -- the '333 patent, the '334 patent, and the '510 patent.  Only the '510 patent had been listed in the Orange Book.  Because the Rolf patents had not been listed in the Orange Book when Watson filed its ANDA, the Rolf Patent Litigation did not result in a 30-month Hatch-Waxman stay.

1

2

(a)    The '529 Litigation Exposed the Weakness of Endo-Teikoku's '529 Patent

3       73.    After a June 27, 2011 *Markman* hearing in the '529 Litigation, Judge Sleet rejected

4 Endo's claim construction position, strengthening Watson's defense to Endo/ Teikoku's

5 infringement claims.  The '529 Litigation then proceeded to a bench trial in February 2012, in

6 which Watson presented evidence of the invalidity of the '529 patent, as well as evidence that

7 Watson's generic did not infringe the patent.  The evidence at trial was overwhelmingly in favor

8 of Watson, exposing the '529 patent to a determination that it was invalid or unenforceable and

9 that the patent did not cover either the brand product or Watson's generic product.

10       74.    The evidence developed during the '529 Litigation revealed that the same hydrogel

11 transdermal patch technology claimed in the '529 patent had previously been disclosed in

12 multiple pieces of prior art that were not disclosed to the patent examiner, but were well known to

13 Endo/Teikoku (the "Teikoku Prior Art").  Each of the pieces of Teikoku Prior Art discloses a

14 hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent.

15       75.    Each piece of the Teikoku Prior Art discloses an "adhesive gel base" consisting of

16 (i) a water-soluble high molecular weight substance; (ii) water; and (iii) a water-retaining agent,

17 all of which fall within the percentage ranges claimed in the '529 patent.  Each shared at least one

18 inventor with the '529 patent, and also shares the same applicant, prosecuting attorneys, or

19 assignee with the '529 patent.

20       76.    During the prosecution of the '529 patent, the PTO rejected the patent four times,

21 noting that because lidocaine was conventionally used in transdermal patches, it would have been

22 obvious to place lidocaine into available prior art patches.  The applicants consistently

23 distinguished other prior art patches cited by the Examiner, arguing that the patch in the '529

24 patent was "unique."  The applicants never disclosed the Teikoku Prior Art to the PTO, or a prior

25 art patent with the same elements as the '529 patent, which would have showed that the patch

26 technology in the '529 patent was not unique, and in fact had been previously patented.  The PTO

27 never cited the Teikoku Prior Art.

28

77.     Each of these prior art references is prior art to the '529 patent because each was publicly available and accessible more than one year before the March 30, 1991 priority date of the '529 patent.  Each of the prior art references predates the priority date of the '529 patent by over a year, and thus invalidates the '529 patent.  The '529 patent was not capable of preventing Watson from launching its approved generic Lidoderm product.

78.     In addition, the '529 patent did not cover Lidoderm and was not infringed by Watson's generic equivalent.  The patch formulation disclosed in the '529 patent included a water-soluble high-molecular-weight substance, water, and a water-retaining agent.  The water-soluble high-molecular-weight substance and the water-retaining agent must be from the groups listed in the patent.  The groups listed in the '529 patent are known as Markush groups.  "A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C."  *Endo Pharm. Inc., et al., v. Watson Labs., Inc.,* slip op. at 1 n.1, No. 10-138 (GMS) (D. Del. June 27, 2011) (quoting *Abbott Labs. v. Baxter Pharm. Prods.,* 334 F.3d 1274, 1280 (Fed. Cir. 2003)).

79.     In the '529 patent, the first Markush group related to "a water-soluble high molecular weight substance selected from the group consisting of gelatin, starch, agar, mannan, alginic acid, polyacrylic acid, a salt of polyacrylic acid, dextrin, methylcellulose, methylcellulose sodium, carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth, karaya gum and locust bean gum."

80.     The second Markush group related to "a water-retaining agent selected from the group consisting of ethylene glycol, diethylene glycol, polyethylene glycol, glycerin, sorbitol, martitol, propylene glycol and 1,3-butylene glycol."

81.     As the District Court held in its *Markman* decision construing those two patent terms, Federal Circuit precedent from 2003 clearly established that both of the relevant Markush groups in the '529 patent were limited to one and only one of the listed alternatives.  *Endo Pharm. Inc., et al., v. Watson Lab., Inc.,* slip op. at 1 n.1-2.  Under Federal Circuit precedent, the

1    patent must be interpreted to cover a product that contains only *one* of the substances from each
2    of the two Markush groups.

3          82.    Watson's generic Lidoderm product contained at least *four* water-soluble high-
4    molecular-weight substances, and *three* water-retaining agents. (So does Lidoderm.) Thus, it did
5    not infringe the '529 patent because it contained more than one substance from each Markush
6    group. As a result, Watson's generic Lidoderm did not infringe the '529 patent. The '529 patent
7    was not capable of preventing Watson from launching its approved generic Lidoderm product.

8                            (b)    The Rolf Patent Litigation

9
10         83.    The Rolf patents afforded Endo/Teikoku no basis to prevent Watson from
11   launching its approved generic Lidoderm product, either. Endo/Teikoku sued Watson only on
12   some of the Rolf patents (the '510, '333, and '334 patents). Watson had raised defenses and
13   counterclaims alleging that those patents were invalid and/or unenforceable and that its product
14   did not infringe them. Endo/Teikoku did not even bother to sue Watson on the '263 patent. The
15   Rolf Patent Litigation barely proceeded past the pleading stage. The Rolf patents posed no
16   reasonable risk to Watson of patent infringement liability.

17         84.    Of the Rolf patents, only the '510 patent had been asserted by its previous owner,
18   LecTec, against Endo with respect to its Lidoderm product in the LecTec Litigation in 2008. As
19   Endo/Teikoku learned from the LecTec Litigation, the '510 patent was subject to a strong
20   invalidity challenge. The '510 patent was invalid as obvious in view of prior art references that
21   were not submitted to the PTO during the prosecution of the '510 patent. Watson was also aware
22   of the infirmities of the '510 patent from the publicly-filed pleadings in the LecTec Litigation.
23   The '510 patent was incapable of preventing Watson from launching its approved generic
24   Lidoderm product.

25         85.    The '333 and '334 patents also were not infringed by Watson. Indeed, during the
26   LecTec litigation, LecTec had not even sued Endo for infringement of the '333 and '334 patents
27   with respect to Lidoderm. When Endo ultimately settled the LecTec Litigation in November
28   2009, it only obtained licenses to the '263 and '510 patents, further demonstrating that licenses to

the '333 and '334 patents were irrelevant to the use, manufacture, or sale of Lidoderm. Watson's generic patch, a copy of the Endo patch, similarly would not infringe the '333 and '334 patents.

86.     Indeed, Endo did not bother to obtain the rights to the '333 and '334 patents until May 2011, when it bought the rights to all of the Rolf patents from LecTec for just $2 million, further evidence that those patents were incapable of preventing Watson from launching its approved generic Lidoderm product. None of the Rolf patents was capable of preventing Watson from launching its approved generic Lidoderm product.

## B.      Endo/Teikoku and Watson Enter the Unlawful Reverse Payment Agreement

87.     On or about May 28, 2012 -- after the February 2012 bench trial and as Endo, Teikoku, and Watson were awaiting a decision from Judge Sleet -- Endo/Teikoku and Watson entered into an agreement ending the patent litigation related to Lidoderm. The Reverse Payment Agreement ended the '529 Litigation and the Rolf Patent Litigation, and obviated the need for Judge Sleet to render decisions on the validity, enforceability, and infringement of the patents Endo/Teikoku had asserted against Watson.

88.     Under the Agreement, Watson agreed to delay launching its generic Lidoderm product until a "Start Date" of September 15, 2013, unless before that date another generic product launched (a virtual impossibility), or Watson faced forfeited of its 180-day exclusivity for failing to go to market (also a virtual impossibility). The Agreement specifically provides:

> Subject to Section 2(d), Watson agrees, on behalf of itself and its Affiliates, that, prior to the Start Date, it and its Affiliates shall not directly or indirectly market, offer to sell, sell, have sold, import, manufacture or have manufactured in the Territory any of Watson's Generic Product. Watson acknowledges and agrees that each of Endo and Teikoku would be irreparably harmed should Watson breach this Section 2(e). Nothing in this Agreement shall prohibit or preclude Watson from exercising its rights under 35 U.S.C. § 271(e)(1).[1]
>
> ***
>
> "Start Date" means the earliest of: (i) September 15, 2013; (ii) the date of Launch of any Generic Product other than Watson's Generic Product; or (iii) the last day before Watson would forfeit its 180-day generic drug exclusivity with respect to its Generic Product due to the operation of 21 U.S.C. 355(j)(5)(D)(ii) as a result of a forfeiture event under 21 U.S.C. 355(j)(5)(D)(i)(I).[2]

---

[1]   Settlement Agreement at Section 2(e).
[2]   *Id.* at Section 1(v).

89.     As one *quid pro quo* for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo/Teikoku promised to share with Watson the monopoly profits they would reap from Lidoderm's extended market exclusivity by paying Watson at least $96 million (in the form of branded Lidoderm provided by Endo/Teikoku at no cost to Watson) at the rate of $12 million per month from January 1, 2013 through August 1, 2013.  Watson was free to sell the brand Lidoderm product and retain the full proceeds of those sales.  This payment was no different than if Endo/Teikoku had made those sales themselves and paid Watson the resulting $96 million in cash.  The Agreement specifically provides:

> Endo/Teikoku shall provide, at no cost, to Watson's Wholesaler Affiliate Brand Product of value totaling twelve million dollars ($12,000,000) per month, as measured at the time of each delivery by the then-prevailing Wholesale Acquisition Cost as defined in the Red Book or, if the Red Book is not available, any other comparable U.S. price listing ("WAC"), on the first business day of each month beginning January 1, 2013 and ending August 1, 2013 (for a total of eight (8) months) for Watson's Wholesaler Affiliate's disposal as provided in Section 3(e).  Endo shall provide to Watson's Wholesaler Affiliate an invoice with respect to such Brand Product, which invoice shall reflect the transfer of Brand Product to Watson's Wholesaler Affiliate at no cost.   Notwithstanding the foregoing, Endo/Teikoku's obligations under this Section 3(b) shall terminate immediately upon the Launch of any Third Party Generic Product in the Territory.  The Brand Product provided to Watson's Wholesaler Affiliate by Endo/Teikoku shall have the same NDC number as the Brand Product sold by Endo.  In any month in which Endo/Teikoku has provided Watson's Wholesaler Affiliate any Brand Product under this Section 3(b), and in which a Third Party has Launched a Generic Product in the Territory, Watson shall either (i) return to Endo a pro rata quantity of the Brand Product delivered by Endo/Teikoku during such month, or (ii) reimburse Endo in cash for the value of the Brand Product (based on the WAC measured at the time of delivery by Endo/Teikoku to Watson's Wholesaler Affiliate), in either case for the pro rata portion of the month on and after such Launch . . . Such return or reimbursement shall be made by Watson to Endo within five (5) business days of the date of the Launch of a Generic Product in the Territory.[3]

* * *

> The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler Affiliate under Sections 3(b) through (d) may be resold solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the Territory on pricing and other terms determined by Watson's Wholesaler Affiliate in its sole discretion, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale. Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and

---

[3]   *Id.* at Section 3(b) (emphasis added).

1    further provided that such price-related contracts shall not conflict with the terms
2    of this Agreement.  Watson shall comply with all Applicable Laws in connection
     with its resale of the Brand Product.[4]

3    90.    Endo/Teikoku also agreed to make additional payments to Watson if Watson did

4    not receive FDA approval for its generic Lidoderm product by January 1, 2014, as well as

5    additional payments if Watson did not receive approval by January 1, 2015.  Neither situation

6    came to pass or was expected to come to pass: Watson received final FDA approval on August

7    23, 2012, within three (3) months of Defendants' execution of the Reverse Payment Agreement

8    91.    As the Agreement expressly provided, this $96 million payment from

9    Endo/Teikoku to Watson was expressly to induce Watson to quit its challenge to Endo and

10   Teikoku's patents:

11       Endo/Teikoku and Watson agree that the Brand Product provided by Endo/Teikoku
12       to  Watson's  Wholesaler  Affiliate  hereunder  is  a  good-faith,  bargained-for
         resolution  of  the  claims  at  issue  in  the  Litigation.   The  Brand  Product  provided
         hereunder is not contingent on any past or future purchase of any product from
13       Endo or Teikoku by Watson or any of its Affiliates.[5]

14   92.    Through the Agreement, Defendants ensured that Watson's sales of Lidoderm

15   would not result in price competition, but rather that Watson would sell brand Lidoderm at the

16   same supracompetitive prices at which Endo had been selling it.  The Agreement provided that

17   Watson would honor all of Endo's price-related contracts honored by Endo's wholesalers.  In

18   fact, Watson maintained the supracompetitive prices for brand Lidoderm throughout the term of

19   the Agreement, generating revenues and profits of close to $96 million from those sales.

20   Watson's sales of branded Lidoderm did not increase output, reduce price, or increase consumer

21   choice; it merely substituted Watson for Endo/Teikoku as the seller of $96 million worth of

22   branded Lidoderm, solely to pay Watson for delaying market entry of its less-expensive generic

23   Lidoderm.

24   93.    As a second payment in exchange for Watson's promise to delay entry of its

25   generic Lidoderm product until September 15, 2013, Endo/Teikoku promised to delay launching

26   an authorized generic version of Lidoderm for 7½ months after Watson's belated launch of

27

28   [4]  *Id.* at Section 3(e).
     [5]  *Id.* at Section 3(i).

1    generic Lidoderm, unless another ANDA filer entered the market during that time (a virtual

2    impossibility that, in fact, did not occur).

3          94.    Endo/Teikoku was otherwise ready, willing, and able to launch an authorized

4    generic version of Lidoderm simultaneously with Watson's launch.  As early as April 2007, Endo

5    and Teikoku had specifically agreed that Endo would be the exclusive licensee for authorized

6    generic Lidoderm.  As shown below, this no-authorized-generic promise effectuated a payment

7    from Endo and Teikoku to Watson of $170 million or more.

8          95.    Endo/Teikoku's agreement not to launch an authorized generic meant that

9    Endo/Teikoku would cede those sales to Watson and Watson would therefore be the sole generic

10   on the market for 7½ months.  This would allow Watson to obtain 100% of generic Lidoderm

11   sales for 7½ months (instead of just 50% if Endo/Teikoku had launched an authorized

12   generic)and additionally permitted Watson to avoid the inter-generic price competition that an

13   authorized generic necessarily creates and thereby maintain an artificially-inflated,

14   supracompetitive generic price for those doubled generic sales.  These doubled revenues and

15   profits were at the expense of Plaintiff, consumers, and competition in general.  The Agreement

16   (which refers to an authorized generic by the acronym "AG") provides:

17         License. Subject to the terms and conditions of this Agreement, Endo/Teikoku
           hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)),
18         royalty-bearing, non-transferable (other than pursuant to Section 21) and non-
           sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents
19         to make, have made, import, use, sell, and offer for sale Watson's Generic product
           in the Territory solely during the License Term.[6]
20
                              *         *         *
21
           AG Product. The license granted pursuant to Section 2(a) shall be partially
22         exclusive for a period of time in that Endo/Teikoku and their respective Affiliates
           shall not market or sell a Generic Product, or authorize or license a Third Party to
23         market or sell an AG Product at any time before the earlier of (i) seven and a half
           (7.5) months from the Start Date, and (ii) the Launch of any Third Party Generic
24         Product in the Territory.[7]

25         96.    Endo/Teikoku's agreement not to launch an authorized generic for 7½ months

26   allowed Watson to double its unit sales *and* charge higher prices for its generic during that time

27

28   _____
     [6]  Settlement Agreement at Section 2(a).
     [7]  *Id.* at Section 2(b) (emphasis added).

1  (because it faced no competition from an authorized generic), and had a cash value to Watson of
2  $170 million or more.

3      97.    Absent the Reverse Payment Agreement and Endo/Teikoku's promise not to
4  launch an authorized generic contained therein, Endo/Teikoku would have launched an
5  authorized generic simultaneously with Watson's entry, which would have resulted in lower
6  prices to Plaintiff would have and cut Watson's revenues and profits from selling generic
7  Lidoderm by at least half.

8      98.    In fact, at their first opportunity following the expiration of the no-authorized-
9  generic promise, Endo/Teikoku immediately launched an authorized generic.

10     99.    The Reverse Payment Agreement contained a term whereby Watson agreed to pay
11 back to Endo/Teikoku a small (25%) portion of Watson's increased profits resulting from
12 Endo/Teikoku's agreement not to launch an authorized generic for 7½ months.  That term
13 provided: "Beginning with the First Commercial Sale of Watson's Generic Product and until the
14 date of the occurrence of the First Commercial Sale by a Third Party or Endo/Teikoku or their
15 Affiliates of a Generic Product or AG Product in the Territory, Watson shall pay to Endo royalty
16 payments equal to twenty-five percent (25%) of all Gross Profit of Watson's Generic Product."[8]

17     100.   This term providing for a 25% royalty back to Endo/Teikoku during the 7½ month
18 period was window dressing for the parties' naked agreement not to compete during Watson's
19 anticipated 180-day Hatch-Waxman exclusivity period.  The royalty was designed merely to give
20 the appearance of a legitimate, non-collusive transaction.  In reality, Defendants simply agreed to
21 lengthen the no-authorized-generic promise's duration by 1½ months (from 6 months to 7½
22 months) in order to mitigate the royalty Watson would be paying to Endo/Teikoku.

23     101.   Plaintiff's estimate that Endo/Teikoku's payment to Watson by the no-authorized
24 generic promise amounts to $170 million or more already accounts for an assumed 25% royalty
25 paid by Watson back to Endo/Teikoku.

26     102.   Endo/Teikoku sacrificed substantial revenues and profits by agreeing not to launch
27 an authorized generic for 7½ months.  Absent the Reverse Payment Agreement and the delay in

28

---

8   *Id.* at Section 3(a).

generic Lidoderm competition it effectuated, it would have made economic sense for Endo/Teikoku to launch an authorized generic simultaneously with Watson's launch so that Endo/Teikoku could retain sales that Watson's less expensive generic otherwise would capture rather than ceding those sales to Watson.  As alleged above, an authorized generic product typically captures approximately 50% of the generic sales during first 180 days of generic marketing.

103.    The no-authorized-generic promise was a very large payment to Watson.  Using a conservative approach that relies upon the revenue numbers that Endo reported in its filings with the Securities and Exchange Commission as an input for the annual revenue from Lidoderm, and values as of the time the Reverse Payment Agreement was entered, Plaintiff estimates that the no-authorized-generic constituted a payment of $170 million or more from Endo/Teikoku to Watson. This figure is estimated by calculating the difference between Watson's expected revenues during the first 7½ months free from competition from Endo/Teikoku's authorized generic and what Watson's revenues would have been during those 7½ months had Watson faced competition from Endo's authorized generic.  Both of these amounts can be estimated using the known dynamics of the pharmaceutical industry and publicly-available information.

104.    The revenue that Watson would expect to earn from sales of generic Lidoderm during its first 7½ months of marketing free from competition from Endo/Teikoku's authorized generic can be estimated as follows:

a.    At the time Defendants entered the Agreement, Endo had reported that its annual revenue from sales of Lidoderm in the prior year, 2011, was $825 million.  Thus, at the time of the Agreement, 7½ months of branded Lidoderm sales would generate revenue to Endo of at least $515,625,000 (7.5/12 * $825,000,000).[9]

---

[9]   That number is conservative, as it does not account for any increase in sales achieved by Endo/Teikoku in 2012 and 2013, during the period of delayed generic Lidoderm competition purchased by Endo/Teikoku's payments to Watson.  In fact, Endo/Teikoku's Lidoderm revenue rose from $825 million in 2011 to $947 million in 2012.

b.   As is common in the pharmaceutical industry, the first generic is typically expected to take 80% (or more) of the brand's unit sales within six months. Thus, approximately $412,500,000 worth of brand unit sales would be converted to Watson's generic during the first 7½ months that Watson's generic Lidoderm was on the market ($515,625,000 * .8).

c.   As is also common, with only one generic on the market, the generic is typically priced at 90% of the brand's pre-generic price, which would result in generic sales revenues during the first 7½ months that Watson was on the market of approximately $371,250,000 (412,500,000 * .9).  Thus, the sales revenues Watson would have obtained during the 7½ months that the no-authorized-generic promise was in effect were approximately $371,250,000.

d.   Under the Agreement, Watson agreed to pay Endo/Teikoku a royalty of 25% on Watson's gross profits on sales of generic versions of Lidoderm during the 7½ month period that the no-authorized-generic promise was in effect. Conservatively applying the royalty on $371,250,000 in sales (as opposed to the lower number that would reflect Watson's gross profits), and further assuming that royalties were actually paid, this would amount to approximately $92,812,500 ($371,250,000 * .25).  As a result, even when the amount of the royalty is subtracted out, Watson's anticipated revenue during its first 7½ months free from competition from Endo/Teikoku's authorized generic would be, conservatively, $278,437,500 ($371,250,000 - $92,812,500).

105.    Watson's dramatically smaller revenues if Endo/Teikoku had not promised to refrain from launching an authorized generic for 7½ months following Watson's launch can be estimated as follows:

a.   According to an FDA study of the dynamics of generic competition, the addition of a second generic (such as Endo/Teikoku's authorized generic)

drives the average generic price down to 52% of the brand price.[10]  Thus, while the generics would still take 80% of brand sales during those first 7½ months, or $412,500,000 at the branded Lidoderm price, the dollar value of those generic sales would drop to $214,500,000 in the presence of an authorized generic ($412,500,000 * .52).

b.  Watson would not get 100% of those revenues, however.  That is because the unit sales of the generic during those first 7½ months would be split evenly between Watson's generic Lidoderm and Endo/Teikoku's authorized generic Lidoderm.[11]  (This is conservative because there is reason to expect that Endo/Teikoku may have enjoyed a marketing advantage as the incumbent and could garner more than 50% of unit sales.)

c.  Thus, without Endo/Teikoku's no-authorized generic promise, Watson's revenues from sales of generic Lidoderm during the first 7 ½ months on the market would have been $107,250,000 ($214,500,000 * .5).

106.  The incremental revenue that Endo/Teikoku paid to Watson through the no-authorized-generic promise is therefore $171,187,500 ($278,437,500 - $107,250,000).  That amount is the payment that Endo/Teikoku made to Watson by way of the no=authorized generic promise contained in the Reverse payment Agreement.  This estimate assumes that, rather than Defendants' entering an agreement that allowed Watson to enter without Endo/Teikoku paying Watson to delay its entry, Watson would have entered the market "at risk" in the "but-for-world" (i.e., in a world absent the reverse payments challenged by this lawsuit).

107.  Alternatively, had the parties settled the patent litigation without Endo/Teikoku paying Watson to delay entry of its generic Lidoderm, and assuming a term in that agreement

---

[10]   Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm (last accessed January 19, 2015).

[11]   FTC Study at vi (The FTC has concluded that, when free from competition from an authorized generic, "the first-filer's revenue will approximately double" during the first six months of generic competition, compared to what the first filer would make if it faced authorized generic competition.).  The Supreme Court has recognized this as well.  *See Federal Trade Comm'n v. Actavis, Inc.,* 133 S. Ct. 2223, 2229 (2013) (the "vast majority of potential profits for a generic drug manufacturer materialize during" the first six months of marketing).

1   requiring Watson to pay a royalty of 25% during the first 7½ months of Watson's generic

2   marketing, the royalty on those sales would be $26,812,500 ($107,250,000 * .25).  Thus, net of

3   royalties, the revenue Watson would have realized during the first 71/2 months of marketing from

4   an earlier licensed entry with competition from Endo/Teikoku authorized generic would be

5   $80,437,500 ($107,250,000 - $26,812,500).

6        108.    The incremental revenue that Endo/Teikoku paid to Watson by the no-authorized

7   generic promise is therefore approximately $198,000,000 ($278,437,500 - $80,437,500).  That

8   amount is the payment that Endo/Teikoku made to Watson by way of the no-authorized-generic

9   promise contained in the Reverse Payment Agreement.  This second estimate assumes that, rather

10   than Watson entering the market at risk, Defendants would have entered into an agreement that

11   allowed Watson to enter without Endo/Teikoku paying Watson to delay its entry in the "but-for-

12   world" (i.e., in a world absent the reverse payments challenged by this lawsuit).

13        109.    Thus, Endo/Teikoku's agreement not to launch an authorized generic version of

14   Lidoderm for 7½ months was a payment to Watson of at least $170 million and possibly $198

15   million or more.  And, given that Lidoderm revenues increased significantly to $947 million in

16   2012, the size of the payment almost certainly increased by the time Watson ultimately received it

17   in September of 2013, when Watson belatedly launched without competition from

18   Endo/Teikoku's authorized generic.

19        110.    The total payment flowing from Endo/Teikoku to Watson, including both the $96

20   million in free goods and Endo/Teikoku's promise to delay launching an authorized generic

21   version of Lidoderm for 7½ months had a cash value in the hundreds of millions of dollars.

22   Although Plaintiff does not have the burden of production or of proof on Defendants' affirmative

23   defenses by doing so, Plaintiff nevertheless alleges that Defendants can offer no cognizable,

24   nonpretextual justification or explanation for the reverse payments.  The reverse payments are far

25   greater than Endo/Teikoku's avoided litigation costs, and were not for services to be provided by

26   Watson to Endo/Teikoku.  Rather, the reverse payments were made in order to induce Watson to

27   stay out of the lidocaine patch 5% market until September of 2013 and to allow Defendants to

28   share monopoly profits.

111.    These large, unjustified payments have no rational connection to, and far exceed, any approximation of the costs of continuing the patent litigation.  Moreover, Defendants are unable to establish that either payment was consideration for the fair value of any services provided by Watson to Endo/Teikoku.  Indeed, Watson was not required to perform any services in exchange for the unlawful payment according to the Reverse Payment Agreement.  Watson provided no value to Endo/Teikoku under the Agreement other than an impermissible agreement to delay competition.  The Agreement was not a distribution agreement and Endo had no need for any such services for Lidoderm in any event.

112.    Absent Endo/Teikoku's unlawful reverse payments to Watson, any agreement settling the patent litigation would have permitted Watson to enter the market much earlier than the date agreed to as a result of the payments.  But for the reverse payments, Watson would have launched much earlier than September 2013, either under an agreement without any reverse payments, or at risk after final approval.  And, in either circumstance, Watson's entry would have been immediately met with Endo/Teikoku's authorized generic.

**C.    Anticompetitive Purpose and Effect of Defendants' Conduct**

113.    The unlawful Reverse Payment Agreement enabled Defendants to: (a) delay the entry of less expensive generic version of Lidoderm products in the United States for up to 13 months; (b) delay the introduction of an authorized generic lidocaine patch 5% for 7½ months, which otherwise would have appeared on the market coincident with initial generic competition; (c) fix, raise, maintain or stabilize the price of lidocaine patch 5% products; (d) maintain a monopoly in the U.S. market for lidocaine patch 5% products; (e) allocate 100% of the United States market for lidocaine patch 5% to Endo/Teikoku for up to 13 months; and (f) allocate 100% of United States sales of generic lidocaine patch 5% to Watson for 7½ months.

114.    But for the unlawful Agreement: (a) Watson would have begun selling its generic version of Lidoderm when it received FDA approval on August 23, 2012 or shortly thereafter, either "at risk" or pursuant to an agreement with Endo/Teikoku that did not include a reverse

1    payment; and (b) Endo/Teikoku would have launched an authorized generic lidocaine patch 5%

2    simultaneously with Watson's earlier entry.

3        115.    Watson would have launched its generic product notwithstanding any patents that

4    Endo/Teikoku may have claimed covered Lidoderm, prior to resolution of the '529 Litigation,

5    and prior to resolution of the Rolf Patent Litigation.  None of the patents other than the '529

6    patent was even listed in the Orange Book when Watson filed its ANDA.  Thus, Watson was not

7    required to certify to any other patents under Hatch-Waxman, and any litigation filed over those

8    other patents would not, and could not, result in a 30-month Hatch-Waxman stay of FDA

9    approval of Watson's ANDA.  Furthermore, given the obvious defects in the '529 patent and Rolf

10   patents, Watson would have launched upon final FDA approval even in the absence of a court

11   ruling on those patents.  Once Watson obtained FDA approval of its ANDA, it was free to launch,

12   and but for the unlawful reverse payments, Watson would have launched its generic Lidoderm

13   immediately, and Endo/Teikoku would have launched an authorized generic simultaneously.

14       116.    Watson told Wall Street analysts in late 2011 and early 2012 that it was pursuing

15   its ANDA, it was closely monitoring the progress of the ANDA and expected approval in 2012,

16   that its efforts to increase capacity were well underway, and it expected to be "ready to go at the

17   earliest possible time to launch the product."

18       117.    Alternatively, but for the unlawful reverse payments, Endo, Teikoku, and Watson

19   would have entered into a procompetitive settlement agreement under which Endo and Teikoku

20   would not have paid Watson for delay, Watson would have entered the market much earlier than

21   September of 2013, and Endo/Teikoku would have simultaneously launched an authorized

22   generic lidocaine patch 5%.

23       118.    Defendants' unlawful actions have delayed the sale of generic Lidoderm in the

24   United States, delayed the sale of an authorized generic Lidoderm in the United States, and

25   unlawfully enabled Endo/Teikoku, and then Watson, to sell lidocaine patch 5% at artificially

26   inflated, supracompetitive prices.  But for Defendants' illegal conduct, generic competition to

27   Lidoderm would have begun prior to September 15, 2013 and would have included both

28   Watson's generic Lidoderm product as well as Endo/Teikoku's authorized generic Lidoderm.

## VI.    INTERSTATE COMMERCE

119.    The drugs at issue in this case are sold in interstate commerce.  Defendants' unlawful activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

## VII.    MONOPOLY POWER AND MARKET DEFINITION

120.    At all relevant times, Endo had market and/or monopoly power over lidocaine patch 5% because it had the power to maintain lidocaine patch 5% prices at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated versions of generic Lidoderm.

121.    A small but significant, non-transitory price increase to Lidoderm by Endo would not have caused a significant loss of sales to drug products other than AB-rated generic versions of Lidoderm.

122.    Lidoderm does not exhibit significant, positive cross elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

123.    Because of, among other reasons, its approved indication, Lidoderm is differentiated from all products other than AB-rated generic versions of Lidoderm.

124.    Endo needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo unable to profitably maintain its supracompetitive prices for Lidoderm without losing substantial sales.

125.    Endo sold Lidoderm at prices well in excess of marginal costs, in excess of the competitive price, and enjoyed high profit margins.

126.    Endo had, and exercised, the power to exclude and restrict competition to Lidoderm and its AB-rated generics.

127.    Endo/Teikoku's reverse payments to Watson demonstrate that Endo enjoyed market and/or monopoly power with respect to lidocaine patch 5%.

128.    Endo, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

129.    To the extent that Plaintiff may be legally required to prove market and/or monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is lidocaine patch 5% (*i.e.,* Lidoderm and its AB-rated generic equivalents). During the period relevant to this case, Endo was able to profitably maintain the price of lidocaine patch 5% well above competitive levels.

130.    The relevant geographic market is the United States, including its territories, possessions and the Commonwealth of Puerto Rico.

131.    Prior to September 15, 2013, Endo's market share in the relevant market was 100%, implying a substantial amount of market power.

## VIII.    CONTINUING EFFECT ON COMPETITION AND DAMAGES

132.    Watson's ANDA was approved August 23, 2012.  Were it not for the unlawful reverse payments and Reverse Payment Agreement alleged herein, Watson would have entered the market on or shortly after that date.  One or more generic Lidoderm products would have entered the market well before the date provided in Defendants' unlawful Reverse Payment Agreement, September 15, 2013.

133.    But for the unlawful Reverse Payment Agreement, an authorized generic version of Lidoderm would have been available on the market simultaneously with the launch of Watson's generic.

134.    As a result of Defendants' unlawful conspiracy, Plaintiff and its assignors continued to pay overcharges at the time this action was filed, and continue to pay overcharges today, notwithstanding Watson's launch of generic Lidoderm in September 2013 and Endo's launch of an authorized generic 7 1/2 months later in May 2014.  The commencement of generic competition does not immediately create a competitive environment that is indistinguishable from the environment that would have existed had generic competition begun much earlier.  In fact, it

1    can take considerable time for the process of generic competition to eliminate the effects of prior

2    anticompetitive conduct, for several reasons, all of which apply here.

3         135.    First, generic substitution rates do not immediately reach their maximum level

4    when an AB-rated generic drug is launched.  While generic substitution by Plaintiff typically

5    reaches a level of 90% in approximately three months, generic substitution rates continue to

6    increase gradually and incrementally after that time and eventually reach 95% or more, at which

7    point they plateau.  It may take a year or longer for generic substitution rates to reach this

8    maximum level.  Until they do, the actual generic substitution rate will be lower than it would

9    have been had generic entry occurred earlier and Plaintiff (or their assignors) will continue to

10   purchase units of the branded drug that would have been replaced with units of the less expensive

11   generic drug but for the antitrust violation.  Generic substitution of generic Lidoderm for branded

12   Lidoderm had not reached this maximum 95% level at the time this action was filed and has not

13   yet reached those levels today.

14        136.    Second, generic prices do not immediately drop to the level they would have

15   achieved had generic competition begun earlier.  Generic prices typically fall over time even in

16   the absence of additional generic entrants so long as the number of generic manufacturers in the

17   market does not decrease.  In this case, generic prices were relatively high after Watson's belated

18   launch of generic Lidoderm in September 2013 because Watson did not face competition from an

19   authorized generic (a direct result of Defendants' illegal conspiracy).  Even after Endo's launch of

20   its authorized generic in May 2014 (through its subsidiary Qualitest), generic prices have

21   remained relatively high and continue to remain relatively high today.  Had generic competition

22   begun in 2012, as it would have absent Defendants' unlawful conspiracy, inter-generic

23   competition would have been underway for a longer period of time and generic prices would have

24   fallen to lower levels than the generic prices Plaintiff (or its assignors) are paying today.

25        137.    The fact that generic competition substitution rates and generic prices can take

26   considerable time to reach the equilibrium levels they would have reached had generic

27   competition begun earlier means that Plaintiff not only will continue to pay overcharges on its

28   purchases of branded Lidoderm for some period of time after the commencement of generic

competition, but also means that Plaintiff will pay overcharges on its purchases of generic Lidoderm for some period of time after generic Lidoderm became available.  For example, during the period from September 2013 to May 2014, Plaintiff (or its assignors) would have purchased generic Lidoderm from Watson at relatively high prices made possible by Watson's monopoly on generic Lidoderm.  But for Defendants' unlawful conduct, Plaintiff (or its assignors) would have purchased generic Lidoderm during that period (and afterward) at more competitive prices reflecting the availability of generic Lidoderm from more than one source.  These generic-generic overcharges continue to accrue today and will continue to accrue into the future.

138.    In addition to the continuing harm resulting from Defendants' unlawful conspiracy relating to Lidoderm, there is a substantial risk of recurrent antitrust violations by Defendants. This is not the first antitrust case in which these Defendants have been accused of anticompetitive conduct designed to delay generic entry.  Endo is a defendant in another pending pharmaceutical antitrust case involving the drug Opana ER.  *See In re Opana ER Antitrust Litigation*, MDL Docket No. 2580, Case No. 14-cv-10150 (N.D. Ill.).  Watson/Actavis is a defendant in pending antitrust litigation by both the Federal Trade commission and private plaintiffs involving the drug Androgel.  *See Federal Trade Comm'n v. Actavis, Inc.*, 133 S. Ct. 2224 (2013).  Warner Chilcott, which is owned by Actavis, was a defendant in prior antitrust litigation involving the drug Ocvon 35.  *See Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38 (D.D.C. 2008).

139.    Defendants' unlawful reverse payments and Reverse Payment Agreement have delayed generic Lidoderm competition and have unlawfully enabled Endo to sell Lidoderm without generic competition.  But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Lidoderm on August 23, 2012 or shortly thereafter, and in any event, earlier than September 15, 2013.

140.    Watson has extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs, marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

141.    Defendants' unlawful Reverse Payment Agreement, which delayed introduction of generic versions of Lidoderm in the United States, has caused Plaintiff and/or its assignors to pay

1   more than they would have paid , and to continue to pay more than they would have paid, for

2   lidocaine patch 5%.

3          142.    But for Defendants' unlawful Agreement, Plaintiff and/or its assignors would have

4   paid less for lidocaine patch 5% by (a) substituting purchases of less-expensive AB-rated generic

5   Lidoderm for their purchases of more-expensive brand Lidoderm, and/or (b) purchasing generic

6   Lidoderm at lower prices sooner.

7          143.    Thus, Defendants' unlawful conduct deprived Plaintiff and its assignors of the

8   benefits of competition that the antitrust laws were designed to protect.

9          144.    During the relevant period, Plaintiff and/or its assignors have purchased substantial

10  amounts of Lidoderm directly from Endo and purchased substantial amounts of generic Lidoderm

11  directly from Watson or Qualitest.  As a result of Defendants' illegal conduct as alleged herein,

12  Plaintiff and/or its assignors were compelled to pay, and did pay, artificially inflated prices for

13  their lidocaine patch 5% requirements.  Plaintiff and/or its assignors paid prices for lidocaine

14  patch 5% that were substantially greater than the prices that they would have paid absent the

15  illegal conduct alleged herein, because: (1) Plaintiff and/or its assignors were deprived of the

16  opportunity to purchase lower-priced generic Lidoderm instead of more expensive brand

17  Lidoderm; and (2) Plaintiff and/or its assignors paid artificially inflated prices for generic

18  lidocaine patch 5%.

19         145.    As a consequence, Plaintiff and/or its assignors have sustained substantial losses

20  and damage to their business and property in the form of overcharges, the exact amount of which

21  will be the subject of proof at trial.  Plaintiff's injury is injury of the type the antitrust laws were

22  designed to prevent and flows from that which makes Defendants' acts unlawful.

23         146.    Defendants' conduct threatens continuing loss and damage to Plaintiff and/or its

24  assignors unless enjoined by this Court.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IX.    CLAIMS FOR RELIEF

### Claim I: Violation of 15 U.S.C. § 1
### (Conspiracy in Restraint of Trade)

147.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 146 above as though fully set forth herein.

148.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.    In or about May 2012, and at times prior to the formal execution thereof, Defendants entered into the Reverse Payment Agreement, an illegal contract, combination, and conspiracy in restraint of trade under which Endo/Teikoku agreed to make large reverse payments to Watson in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market for up to 13 months, the purpose and effect of which were to: (a) allocate 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delay the availability of generic versions of Lidoderm in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any  generic competition; (c) delay the entry of Endo/Teikoku's authorized generic until 71/2 months after Watson's entry with a generic Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, to Watson prior to that time; and (d) fix, at supracompetitive levels, the price which direct purchasers would pay for lidocaine patch 5%.

150.    The Agreement was likely to have a substantially adverse effect on competition in the relevant market and is unlawful under the rule of reason.

151.    In the alternative, the Agreement constitutes a horizontal market allocation agreement which allocated the market temporally rather than geographically and is unlawful *per se*.[12]

---

[12]   This allegation is included solely to preserve Plaintiff's appellate rights.  Plaintiff understands that the Court has rejected the contention that Defendants' agreement is unlawful *per se*  (Case No. 14-md-2521, ECF Doc. 117, at 26-27) and do not dispute that the Court would reach the same result in this case.

152.    There is and was no legitimate, non-pretextual, precompetitive justification for the payment from Endo/Teikoku to Watson that outweighs its harmful effect.  Even if there were some conceivable such justification, the payment was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

153.    As a direct and proximate result of Defendants' agreement in restraint of trade, as alleged herein, Plaintiff was harmed and suffered overcharge damages as set forth above.

### Claim II: Violation of 15 U.S.C. § 2
### (Conspiracy to Monopolize)

154.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 146 above as though fully set forth herein.

155.    At all relevant times, Endo possessed substantial market power (*i.e.,* monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

156.    Through the Reverse Payment Agreement, Endo/Teikoku, and Watson conspired to maintain Endo's monopoly power in the relevant market in order to block and delay market entry of generic Lidoderm.

157.    The Reverse Payment Agreement:  (a) allocated 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delayed the availability of generic versions of Lidoderm in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any generic competition; (c) delayed the entry of Endo/Teikoku's authorized generic until 71/2 months after Watson's entry with a generic Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson prior to that time; and ; (d) fixed, at supracompetitive levels, the price which direct purchasers would pay for lidocaine patch 5%.

158.    The goal, purpose, and/or effect of the Agreement was to maintain and extend Endo's monopoly power in the United States market in the market for lidocaine patch 5%, in

violation of Sherman Act Section 2, 15 U.S.C. § 2.  The Agreement was intended to and did prevent and/or delay generic competition to Lidoderm and enabled Endo to continue charging supracompetitive prices for Lidoderm without a substantial loss of sales.

159.    Defendants knowingly and intentionally conspired to maintain and enhance Endo's monopoly power in the relevant market.

160.    Defendants specifically intended that their Agreement would maintain Endo's monopoly power in the relevant market, and injured Plaintiff thereby.

161.    As a direct and proximate result of Defendants' concerted monopolistic conduct, as alleged herein, Plaintiff was harmed and suffered overcharge damages as set forth above.

**Claim III: Violation of 15 U.S.C. § 2**
**(Monopolization)**

162.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 146 above as though fully set forth herein.  This claim is asserted against Endo only.

163.    At all relevant times, Endo possessed substantial market power (*i.e.,* monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

164.    Through the anticompetitive conduct, as alleged extensively above, Endo willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff thereby.

165.    It was Endo's conscious objective to further their dominance in the relevant market by and through the anticompetitive conduct alleged herein.

166.    Endo's anticompetitive conduct harmed competition as alleged herein.

167.    As a direct and proximate result of Endo's illegal and monopolistic conduct, as alleged herein, Plaintiff was harmed and suffered overcharge damages as set forth above.

**Claim IV: Violation of 15 U.S.C. § 2**
**(Attempt to Monopolize)**

168.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 146 above as though fully set forth herein.  This claim is asserted against Endo only.

169.   Through the Reverse Payment Agreement, Endo specifically intended to maintain monopoly power in the relevant market.  It was Endo's conscious objective to control prices and/or to exclude competition in the relevant market.

170.   The natural and probable consequence of Endo's anticompetitive conduct, which was intended by Endo and plainly foreseeable to Endo, was to control prices and exclude competition in the relevant market.

171.   There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

172.   As a direct and proximate result of Endo's illegal and monopolistic conduct, Plaintiff was harmed and suffered overcharge damages as set forth above.

## X.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants and grant the following relief:

A.    A declaration that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act;

B.    Permanent injunctive relief (i) enjoining Defendants from continuing their illegal conduct; (ii) enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of delaying the entry of other generic drugs; and (iii) requiring Defendants to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

C.    An award of Plaintiff's overcharge damages, in an amount to be determined at trial, trebled;

D.    An award of Plaintiff's costs of suit, including reasonable attorneys' fees as provided by law; and

E.    Such other and further relief as the Court deems just and proper.

1

## XI.    JURY DEMAND

2

3
                    Plaintiff demands a trial by jury on all issues so triable.

4
Dated: January 22, 2016                    Respectfully submitted,

5

6
                                            _/s/  Anna T. Neill_____
                                           Anna T. Neill (State Bar No. 270858)
7
                                           Kenny Nachwalter, P.A.
                                           1100 Miami Center
8
                                           201 South Biscayne Blvd.
                                           Miami, Florida 33131-4327
9
                                           Telephone:   (305) 373-1000
10
                                           Facsimile:    (305) 372-1861
                                           Email: aneill@knpa.com
11
                                           ***Attorneys for Plaintiff***

12
Of Counsel:
13
Monica L. Rebuck
Eric L. Bloom
14
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
4400 Deer Path Road, Suite 200
15
Harrisburg, PA 17110
(717) 364-1030
16
Email: mrebuck@hangley.com
Email: ebloom@hangley.com
17

18
Barry L. Refsin
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
19
Philadelphia, PA 19103
(215) 496-7031
20
Email: brefsin@hangley.com

21

22

23

24

25

26

27

28